PACIFIC DOOR & SASH CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 14481, 18898, 21186.    Promulgated June 13, 1930.

*George H. Koster, Esq.*, for the petitioner.
*James L. Backstrom, Esq.*, for the respondent.

76

OPINION.

VAN FOSSAN: There are two issues involved in these cases: (1) Whether respondent erroneously reduced the petitioner's invested capital in the years 1919, 1920, and 1921, and (2) whether respondent erred in denying special assessment for the years 1919 and 1920 under the provisions of section 327 of the Revenue Act of 1918. The reduction in invested capital during the several years is dependent upon the determination of the amount of petitioner's invested capital as of August 1, 1918.

Upon the liquidation of the old Pacific Sash & Door Co. three groups of stockholders received the various assets of that corporation in accordance with an agreement entered into among themselves. The first group, consisting of William E. Hampton alone, received the real estate; the second group, composed of J. M. Carpenter and

others, received the cash and liquid assets; while the third group, represented by E. A. Nicholson and C. E. Miller, received the machinery, equipment, merchandise inventories and other assets required in the manufacturing process. These three groups attempted to divide the assets of the old corporation in proportion to the amount of its stock held by them. The respondent included in the petitioner's invested capital the sum of $109,454.49 representing the net book cost and value of the merchandise inventories as determined and accepted by the Nicholson-Miller group. The respondent likewise included in the petitioner's invested capital the machinery and equipment item at $50,700.98, the value at which the Nicholson-Miller group accepted that item after having made an arbitrary reduction of approximately 35 per cent from the net book value as determined by the books of the Pacific Sash & Door Co..

The petitioner claims that the proper value of the machinery and equipment so taken over by the petitioner from the Nicholson-Miller group was $125,000. That figure, however, was at best merely an estimate or opinion offered by E. A. Nicholson, general manager of the petitioner. That estimate was supported by no evidence whatever tending to show the basis of the fair market value as alleged. No itemization of articles comprising the machinery and equipment schedule was attempted by Nicholson, nor did it appear by what process of reasoning or method of comparison he arrived at the figures stated. The record, however, discloses the figure of $78,418.74, to which may be added the sum of $10,000 representing the installation costs which were actually expended but were charged to expense rather than capital account. This figure of $78,418.74 was called the net book value. It was used as the basis on which the division of assets of the Pacific Sash & Door Co. among its several stockholders was accomplished. The merchandise inventories amounting to $109,454.49 were calculated on exactly the same basis and were so included by the respondent in the capital assets of the · petitioner, to which they were transferred by the intermediate owners. No objection to such action was made by the petitioner. Therefore, we may assume that such figure represents their fair market value on August 1, 1918.

The item of $50,700.98, presumed by the respondent to represent the fair market value of the machinery and equipment of the petitioner with which it started business on August 1, 1918, has a different history. Carpenter, one of the chief stockholders of the Pacific Sash & Door Co., was badly in need of funds in order to protect certain investments in Oregon. The primary purpose of the liquidation of the old corporation was to provide such funds for him. He and the other members of his group received the cash

and other quick assets of the old corporation. In order to offset this practical advantage and as an inducement to group No. 3 to accomplish the proposed plan of liquidation, the machinery and equipment inventoried at $78,418.74 was reduced by approximately 35 per cent. The reduced figure did not represent its real value. On the record it appears that the real value of such property was the unreduced amount, to which the installation cost of $10,000 should be added. Under the facts as presented, we believe that $88,418.74 is a true measure of the fair market value of the capital assets of machinery and equipment determined by the respondent to be $50,700.98, and we so hold.

The respondent contends, somewhat incidentally, that the determination of invested capital comes within the provision of section 331 of the Revenue Act of 1918. That section is as follows:

In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received. * * *

From an examination of the stockholdings in the two corporations it is apparent that " an interest or control in such trade or business or property of 50 per centum or more (did not remain) in the same person or any of them." Therefore, section 331 is not applicable.

Passing to the second issue, we believe that the contention of the petitioner that it is entitled to special assessment under the provisions of section 328 of the Revenue Act of 1918 is without merit.

We have already determined that the amount of invested capital of the petitioner on August 1, 1918, should be $88,418.74 plus the uncontroverted item of $109,454.49, merchandise inventories, or a total of $197,873.23. This is, therefore, no basis for the plea of the petitioner that its invested capital can not be determined.

The petitioner maintains that by reason of the close friendly relationship between Hampton, the new owner of the plant, and the stockholders of the petitioner, an unusually low rental was charged during the period from August 1, 1918, to June 31, 1919, inclusive. While to a degree such a condition may have existed, doubtless there were many other factors which led to the rental agreement. Hampton found himself in possession of land, buildings, and fixtures peculiarly adapted to the use of the petitioner. The machinery and equipment belonging to the petitioner were already installed therein and Hampton could well afford to contribute the use of his plant during 1918 and to charge a rental of $500 a month during 1919 in

order to secure a tenant whose prospects of prosperity were good. To have attempted to obtain another tenant might have resulted in considerable loss to him. The business done by the petitioner during 1919 justified the execution of the lease calling for $1,000 a month rental for the period of ten years from January 1, 1920. Furthermore, we note that Hampton was not a stockholder or officer in the petitioner corporation.

We are unimpressed by the contention that the degree of skill and experience manifested by the principal stockholders of the petitioner is a basis for special assessment. We may properly assume that all officers and stockholders contributed their best services and efforts in order to earn their own salaries and to produce dividends on their stock.

Nor does the plan established by the petitioner permitting its employees to purchase its stock at par of itself entitle it to special assessment. It is a common arrangement calculated to induce the employees to render their best and most efficient service to the owner's business. We can see no such abnormality in the plan as to bring it within the purview of sections 327 and 328 of the Revenue Act of 1918.

The record reveals no evidence of the fact that the petitioner succeeded to the business and good will of the Pacific Sash & Door Co. In fact, the petitioner places particular emphasis on its assertion that the possessions and properties of all kinds belonging to the Pacific Sash & Door Co. were transferred to its stockholders, and thus the entire assets were divided and distributed among them. Only one group of those stockholders organized themselves into a corporation for the purpose of maintaining the sash and door and millwork-manufacturing business. That group incorporated under another name, quite similar, it is true, to that of the former corporation. The liquidation of the Pacific Sash & Door Co. had eliminated as assets available to the Nicholson-Miller group all cash, accounts receivable, and salable merchandise. It had removed also from the situation Carpenter and Hampton, the principal financial backers of the old company. The petitioner corporation merely occupied the premises formerly used by the Pacific Sash & Door Co. in its business. We are not convinced that there was involved any element of good will sufficient to justify the granting of special assessment.

We are unable to find that the petitioner during the years 1919 and 1920 was subject to such abnormal conditions affecting its capital as to work upon it an exceptional hardship in the imposition of excess-profits taxes in comparison with such taxes computed against average or representative concerns in like businesses.

*Decision will be entered under Rule 50.*